UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATASHA KNOX,

Plaintiff,

– against –

CRC MANAGEMENT CO., LLC, CLEAN RITE
CENTERS- 3553 BOSTON RD., LLC, 4352 BRONX
BLVD. LAUNDROMAT, LLC, CECILIA
ASHMEADE, *individually*, and KEN FERRIS,
*individually*,

Defendants.

**OPINION AND ORDER**

20-cv-4073 (ER)

Ramos, D.J.:

Natasha Knox brings this action against her former employer, CRC Management Co.,

LLC, Clean Rite Centers-3553 Boston Rd., LLC,[1] and 4325 Bronx Blvd. Laundromat, LLC

(collectively "Clean Rite"), and individual defendants Cecilia Ashmeade and Ken Ferris, alleging

discrimination, hostile work environment, and retaliation on the basis of race, national origin,

and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

1981, the New York State Human Rights Law ("NYSHRL"), and the New York City Human

Rights Law.  Knox also seeks to recover unpaid minimum and overtime wages pursuant to the

Fair Labor Standards Act ("FSLA") and the New York Labor Law ("NYLL").

---

[1] The complaint improperly names Clean Rite Centers- 3553 Boston Rd., LLC; the proper entity is Clean Rite
Centers LLC, which has appeared and brings the instant motion for summary judgment.  *See, e.g.* Doc. 61.

Before the Court are:  (1) Clean Rite's motion for summary judgment, seeking dismissal of the complaint in its entirety; and (2) Knox's motion to strike the answer of Ashmeade and Ferris, and to enter default judgment against them.  For the reasons set forth below, both Clean Rite's motion and Knox's motion are respectively GRANTED in part and DENIED in part.

## I.    Background

On December 17, 2018, Natasha Knox, a Black woman of Jamaican descent, was hired as a customer service attendant ("CSA") by CRC Management Co., LLC, a wholly owned subsidiary of Clean Rite Centers LLC.  Doc. 60, Knox's Counter Statement to Defendant's Rule 56.1 Statement, at 1–2, 5.  On the date of her hire, Knox executed a Notice of Acknowledgement of Pay Rate and Pay Day.  Doc. 52-6.  Clean Rite operates approximately seventy laundromats in New York, Ohio, Maryland, and Pennsylvania.  *Id.* at 2.  Clean Rite is composed of a predominately Black workforce.  *Id.* at 11.

On December 21, 2018, Knox started at a Clean Rite laundromat located on White Plains Road in Bronx County, New York (the "Laundromat").  *Id.*  Knox typically worked from 8:00 a.m. to 4:00 p.m. two days per week, and from 4:00 p.m. until 12:00 a.m. two days per week, for a total of approximately 32 hours per week.  Doc. 62-1, Declaration of Natasha Knox ("Knox Decl."), ¶ 22.  She also periodically worked at two other laundromats in Bronx County, one on 3533 Boston Road and another on 4352 Bronx Boulevard, for approximately eight "extra hours" per week.  *Id* ¶ 23; *see also* Doc. 52-2, Knox's September 29, 2021 Deposition Transcript ("Knox Dep."), at 78:2–9.  For most of Knox's employment, she was paid $15.00 per hour and $15.50 per hour for certain overnight shifts.  Knox Decl. ¶¶ 29–30. She was paid $22.50 for overtime hours.  Knox's responsibilities included greeting customers, washing and folding

laundry, maintaining an inventory logbook, and cleaning the washing and drying machines.[2]  Doc. 60 at 2.

Within the first month of her employment, Knox received a copy of the Employee Handbook (the "Handbook"), Doc. 53-2, and agreed to be bound by its policies.  *Id.*; Knox Dep. at 50:13–52:7; 52-4.

In either late January or early February 2019, Knox broke her thumb in a car accident that occurred outside of the scope of her employment.  Knox Dep. at 24:16–19; *see also* Knox Decl. ¶ 8.  After the accident, Knox informed her supervisor, District Lead Vincent Butler, of the injury. He told her not to perform duties that would put too much strain on her hand.  *See* Knox Dep. at 83:7–84:3 ("Q:  So February to about April [2019], you were doing the less heavy wash and folds.  Is that right?  A:  Correct.  Q:  And that was Vincent Butler that put that in place?  A: Yes.).

According to Knox, in February 2019, her colleague, Cecilia Ashmeade—who is also a Black woman of Jamaican descent—started to racially harass her at work.[3]  Knox Decl. ¶ 4.  Knox alleges that Ashmeade criticized her on a daily basis for "[being] too 'hood' and 'ghetto' to work" for Clean Rite and that on one occasion, Ashmeade told her that "the Yankee in

---

[2] According to the declaration of Clean Rite District Lead, Kenneth Ferris, Knox was—ostensibly like all other CSAs— required to do a minimum of 120 pounds of laundry daily.  Doc. 53-1, Declaration of Kenneth ("Ferris Decl.") at 2.

[3] The record before the Court is unclear as to whether Ashmeade was Knox's superior or exercised managerial authority over her.  Knox stated that she initially believed that Ashmeade was a manager or shift supervisor.  Knox Dep. at 22:2–19, 31:11–18.  She also stated that Ashmeade sometimes reimbursed her for cab fare.  *See id.* at 90:6–10.  Knox further claimed that on March 13, 2019, she learned from Neville Baptiste, Regional Leader of Clean Rite, that Ashmeade was, like herself, a CSA and *not* her boss.  *Id.* at 22:20–23:11; 85:1–7.  The declaration of Ferris, however, refers to Ashmeade not as a CSA, but instead, as the "team leader" of the Laundromat.  Ferris Decl. at 2.  In addition, Ashley Peguero—who replaced Ashmeade as team leader, *see id.*— suggests in her declaration that she exercised at least some managerial authority over Knox, noting, for example, that she acted as a liaison between Knox and Ferris and that she conducted her own investigation into Knox's purportedly wrongful conduct, discussed herein.  *See* Doc. 53-3, Declaration of Ashley Peguero ("Peguero Decl."), at 2.  Knox also claims that she believed Peguero was "the new manager."  Knox Dep. at 32:15–18; *see also id.* at 102:2–7 (referring to Peguero as her manager).

3

[her made her] timid." *Id.* ¶ 5.   At the end of February, Knox reported the harassment to Butler during a conversation with him and Ashmeade.  *See* Knox. Dep. at 76:24–77:8.  Sometime thereafter, Knox claims to have complained again to Butler.  And as a result, he promised to meet with Knox.  *Id.* at 77:3–20; 78:23–6.  Before that meeting could take place, however, Butler left Clean Rite.  *Id.*  Based on the lack of evidence set forth by Knox, Clean Rite denies that Ashmeade ever subjected Knox to racial harassment and that Knox ever reported the harassment to Butler.  Doc. 60 at 6–7.

On March 5, 2019, Knox missed work to receive medical treatment for lingering pain relating to her injured finger.  *Id.* at 24:25–25:8; Knox Decl. ¶ 8.  The treating physician instructed her not to lift more than 25 pounds so that her thumb could heal.[4]  *Id.* ¶ 8.  The following day, Knox claims to have informed Ashmeade that she would require an accommodation to lift no more than 25 pounds as a result of her injury.  *Id.* ¶ 9.  Ashmeade purportedly responded that she "shouldn't have this job" if she required an accommodation.  *Id*; *see also* Knox Dep. at 82:17–21 ("[Ashmeade] stated that my finger wasn't that bad . . . . [S]he said, 'You're fine.  You'll be fine.  Just do your job.'").  The following week, on March 11, 2019, Knox alleges that she received a text message from Ashmeade, stating that she intended to remove Knox from the work schedule.  Knox Decl. ¶ 11.  Despite that text message, Knox continued to go into work.

On March 11, 2019, Ken Ferris joined Clean Rite as District Lead.  Ferris Decl. at 2.  According to Ferris, during his first week at Clean Rite, Knox informed him that it was difficult for her to do more than the minimum load of 120 pounds required daily due to her injured

---

[4] According to Knox, she received a doctor's note excusing her for her absence, which she sent to Baptiste.  *See* Knox Dep. at 24:3–25:8.  A copy of this note has not been made part of the record.

thumb.  She indicated that she needed minimum accommodations "and that th[o]se accommodations were already in place[.]"  *Id.*

Two days later, on March 13, 2019, Knox claims to have contacted Baptiste via text message, informing him of the racial harassment, as well as of Clean Right's purported failure to accommodate her injured thumb.  Knox Decl. ¶ 12; *see also* Knox Dep. at 84:20–85:16. According to Knox, Baptiste asked her to forward him a copy of a doctor's note and indicated that "[they] might need to have a conversation if [she couldn't ]do [her] job."  Knox Decl. ¶ 11. Knox also alleges that Baptist informed her that "there would be an investigation" with respect to her complaints of harassment.  *Id.* ¶ 11.

Baptiste offers a different account of this exchange.  According to his declaration, he and Knox spoke over the *phone* on March 13, 2019 and she complained not about harassment, but instead, about a wholly separate issue:  unpaid wages.[5]  Doc. 53, Declaration of Neville Baptiste ("Baptist Decl."), ¶¶ 7–8.  Baptiste further asserts that Knox did not inform him of any failure to accommodate her broken finger.  *Id.*  ¶¶ 12–13.  Rather, he contends that Knox "indicated only that she had a doctor's appointment that week and would miss some work time to attend the appointment," which is why he asked her to send him a doctor's note.  *Id.* ¶ 14.  Baptiste further denies having ever said "we might need to have a conversation if you can't do your job" because he did not learn of Knox's broken finger until *after* her employment with Clean Rite ended.  *Id.* ¶ 18.

In mid-March 2019, Knox alleges that Ferris began to contribute to the already racially hostile work environment by routinely making derogatory comments concerning her race and

---

[5] Knox's claims that in or around March 2019, she complained to Clean Rite's human resources department concerning her missing hours.  Knox Decl. ¶ 28.

nationality.  Knox Decl. ¶ 14.  On one instance, for example, Ferris supposedly told Knox that

she "looked like Aunt Jemima."  *Id.* ¶ 15.  On another instance, he purportedly criticized her for

"talking Jamaican when [she] got upset."  *Id.* ¶ 16.  Clean Rite denies these allegations.  Doc. 61

at 4–5.

On or around March 25, 2019, Knox claims to have met with Ferris to discuss the

harassment, along with missing wages.  *See* Knox Dep. at 80:2–18 (After Ferris replaced Butler,

Knox "began to get to know him, and then [they] discussed . . . meeting to get the harassment

down, and also about [her] wages.").  Ferris does not deny that this meeting took place but

contends that they only discussed missing pay.[6]  Ferris Decl. at 2.  At this time, Knox alleges to

have filed a formal complaint with Ferris regarding unpaid salary.  *See* Knox Dep. at 77:21–78:7.

According to Knox, Clean Rite did not pay her any compensation for the extra hours she

worked at the two other Bronx locations, at either regular rate of pay or with any overtime

premium.  Knox. Decl. ¶ 16; *see also* Knox Dep. at 78:14–19 ("Instead of the hours being put on

[her] check, . . . the time sheet was whitened out and it looked like the hours went on to Cecilia

Ashmeade's check instead of [hers]").  At their meeting, Ferris told Knox that he would take this

information and investigate with the corporate office.  Ferris Decl. at 2; *see also* Knox Dep. at

78:19–20.

Thereafter, Ferris claims that he and Baptiste reviewed all scheduled timesheets from all

three locations where Knox worked and concluded that Knox was indeed properly paid for all of

the hours she stated she had worked.  *Id.*; *see also* Baptiste Decl. ¶ 9 (claiming that he and Ferris

---

[6] Knox claims that this conversation took place approximately at the end or the middle of March.  Knox Dep. at 78:8–14.  Ferris provides the date of March 25, 2019 in his declaration.  Ferris Decl. at 2.  Ferris does not mention of ever having spoken with Knox regarding any harassment.  *Id.*

investigated whether Knox was owed unpaid wages and confirmed that she was paid for all hours worked); Doc. 52-7.[7]  According to Knox, Ferris never got back to her regarding the missing wages.  Knox Dep. at 78:18–22.

On April 5, 2019, Ashley Peguero assumed the role of "team leader" of the Laundromat, replacing Ashmeade.  Docs. 53-3 at 2; Ferris Decl. at 2.  Shortly thereafter, Ashmeade was transferred to another location.  *See* Ferris Decl. at 2 (claiming that Ashmeade was acting team leader of the when he joined Clean Rite on March 11, 2019, but that Ashley Peguero was team leader on April 6, 2019); *see also* Knox Dep. at 32:15–21, 33:19–23 (stating that Ashmeade was transferred to another location in March or April and that Ashmeade and Peguro overlapped for a short period).

According to Peguero, on April 6, 2019, Knox informed her that she had not been paid for hours worked at the other two Bronx laundromats.  Peguero Decl. at 2; *see also* Ferris Decl. Upon advising Ferris of Knox's complaint, Ferris allegedly responded to Peguero that "an investigation on her hours [was] already completed," Peguero Decl. at 2, and that "[Clean Rite would] need proof of any [other] missing hours."  Ferris Decl. at 2.  When Peguero asked Knox for additional evidence, Knox allegedly stated that the proof was contained in an old phone to which she no longer had access.  Peguero Decl. at 2.  Ferris contends that he investigated the matter with Baptiste—apparently for the second time—and concluded that Clean Rite "had indeed compensated . . . Knox correctly for all hours not logged on the timesheet as well as all hours worked in all locations."  *Id.*

---

[7] Document 52-7 contains weekly, handwritten timesheets that show the hours Knox worked for the entirety of her employment at Clean Rite.  Document 52-7 also contains electronically-generated pay summaries that corroborate the total hours and compensation received by Knox each week.

Knox's declaration states that Clean Rite would pay for employees' rides to and from work, and that they were authorized to take money from the cash register for that purpose, so long as they provided a receipt.[8]  Knox Decl. at ¶ 19; *see also* Doc. 60 at 18 ("[Clean Rite] maintained this reimbursement policy throughout [Knox's] employment.").  In contrast, during her deposition, Knox suggested that in general, Clean Rite *only* reimbursed employees for cab rides between different Clean Rite laundromats, when the company unexpectedly called an employee in to cover a shift, or in other inconvenient situations requiring transport to and from work.  She also expressed uncertainty as to whether Clean Rite had a reimbursement policy at all.  *See id.* at 94:4–7; 95:22–96 ("Q:  Now as far as having your cab paid for, I realize it was only when you were called -- a shift you weren't scheduled for or called out of your bed. . . . [W]as this a policy for the company to pay for your cabs under these circumstances? . . .  A:  I don't know if this was a policy or not . . . .  I said if it was an inconvenience, I guess that was the policy.  But that's just what was happening.  I don't know if that was policy or not.").

Knox further claimed that employees of Clean Rite considered the money in the register "petty cash," and that the purpose of leaving a receipt inside the register after withdrawing funds for cab fare was so that the money could be replaced when the manager came back in.  *Id.* at 88:14–21.  Prior to April 14, 2019, Knox retrieved money from the register on only two possible other occasions.  *Id.* at 91:2–10.  Typically, however, she stated that she never had to take money from the register because the money was usually left for her outside of the register with a note on it, or in an envelope; other times, a fellow CSA would hand the money to Knox at the end of his or her shift.  *See id.* at 88:22–90:24.  Knox recounted two other instances when Butler walked

---

[8] Knocks claims that her "manager" (*i.e.*, either Butler or Ashmeade) informed her of this policy upon her hire. Knox Decl. at 3–4.

outside of the Laundromat and paid for her cab fare, either with cash from the register or out of his own pocket. *Id.* at 94:8–13; 96:19–23. Reimbursements of these kinds were purportedly common during Knox's employment. *Id.* at 89:18–25.

Clean Rite admits to reimbursing employees for cab rides and other out-of-pocket expenses from time-to-time, but asserts that no employee was ever permitted to take money from a cash register without prior approval. *Id.* at 3; *see also* Baptiste Decl. (same); Peguero Decl. (same). The Handbook does not reference a reimbursement policy for cab fare or any other incidental work expenses. *See generally* Doc. 53-2.

On the morning of April 14, 2019, Knox took $15 from the cash register and placed therein a receipt for a $15 cab ride from her apartment building to the Laundromat.[9] *See* Ferris Decl. at 2–3; 53-3 at 2–3; 60 at 4. According to Knox, at some point in early April 2019—but before April 14, 2019—Ferris, either over the phone or via text message,[10] gave her permission to take money out of the Laundromat's cash register to reimburse herself for cab fare to or from work, so long as she left a receipt. *See* Knox Dep. at 103:4–104:4. Clean Rite denies that Ferris ever gave Knox such permission. Ferris Decl. at 2.

According to Peguero, on the morning of April 15, 2019, she noticed the receipt and missing cash and subsequently commenced an investigation. Peguero Decl. at 2; Ferris Decl. at 2; Knox Dep. at 88:16–17. Security footage at the Laundromat revealed that Knox had taken the

---

[9] During her deposition, Knox initially stated that she did *not* take money from the register. *See* Knox Dep. at 92:5–13 (Q: You did in fact take money around April 18th from the register. Is that right? A: No. Q: So what, to your mind, happened, was it April 18th, or maybe a few days before that, that there was money missing from the register? A: There was money missing from the register? I don't recall that.). Upon further questioning, she admitted to doing so. *See id.* at 101:20–102:7. In her response to Clean Rite's Rule 56.1 statement, Knox also concedes that she took the $15 from the cash register. Doc. 60 at 4.

[10] Knox stated that she "might" have these text messages. No such text messages have been made part of the record. *See* Knox Dep. at 103:19 –104:6.

cash the prior morning.  *Id.*  Peguero then called Knox and asked if she had taken the money.

*Id.*; *see also* Knox Dep. at 101:6–11.  Knox admitted to taking the $15 to pay for a cab due to her

running late to work, but allegedly refused to return the money due to her missing wages.

Peguero Decl. at 2.  Piguero claims that Knox became hostile and hung up.  *Id.*

After initially claiming that Peguero did *not* contact her about taking money from the

register on or around April 18, 2019,[11] later on in her deposition, Knox ultimately offered an

account of the conversation similar to that of Peguero.  Specifically, Knox admitted to refusing to

give back the money but denied hanging up on Peguero.  *See* Knox Dep. at 102:12–15 ("Why

would I [pay] money back for a cab [when] . . . taking money for . . . [cabs to] work" "has been a

regular thing[?]"), 102:23–103:3.

After the phone call, Peguero notified Ferris, who instructed her to remove Knox from

the schedule until he could further look into the situation.  *See* Ferris Decl. at 2; 53-3 at 2.  That

same day, Peguero documented the incident in a corrective action report (the "Corrective Action

Report").[12]  Peguero Decl. at 3.

The Handbook provides that "[t]heft of any kind [that in any] manner harm[s] the

business operations of" Clean Right "may result in disciplinary action, up to and including

termination of . . . employment[.]"  Doc. 53-2 at 20.  Additionally, "refusing to follow

---

[11] *See id.* at 92:17–93:1 (Q:  Did . . . Pe[g]uero contact you from [sic] taking money from the register on or around April 18?  A:  No, she didn't.  She contacted me about some hours.  That's what they contacted me about.  Q:  She never mentioned that there was money from the register for a cab or anything like that?  A:  I don't recall that.").

[12] The Corrective Action Report provides:  "[O]n 4/14/2019 Natasha Knox took $15 from the drawer to pay for her cab because she was late to work[.]  Natasha did not make anyone aware of this and did not ask [beforehand] if it was okay.  [O]n 4/15/19[,] when I asked what happen to the money in the drawer[,] I was made aware that she had took [sic] $15 because she was running late to work[.]  Natasha had an attitude when being asked about the $15 and said she will not be reimbursing the $15 and hung up the phone on me.  [T]his is not the first instance Natasha has been late.  [I]f her attitude continues she will be terminated[.]  If she continues to be late she will be given a final written warning.  [K]en Ferris[,] my direct leader[,] instructed me to not include her signature but to present this write up on her next shift[,] 4/19."  Peguero Decl. at 3.

supervisor's directions or instructions or other insubordinate conduct" also provides grounds for termination. *Id*. Accordingly, Ferris terminated Knox's employment on April 18, 2010, citing Knox's alleged theft and refusal to return the money in a termination report (the "Employee Discharge Report").[13] *See* Doc. 53-4 at 2; *see also* Docs. 53 ¶ 35; Ferris Decl. at 2. Knox was employed by Clean Rite for four months.

## III.   PROCEDURAL HISTORY

Knox filed this action on May 27, 2020.  Doc. 1.  On September 1, 2020 current counsel for Clean Rite answered the complaint on behalf of all Defendants.  Doc. 20.  Approximately a year and a half later, on January 13, 2022, the Court granted counsel for Clean Rite's request to withdraw as counsel for individually named Defendants Ashmeade and Ferris in light Ashmeade's and Ferris' continued failure communicate with counsel.  Doc. 40.  The Court further directed Ashmeade and Ferris to have new counsel enter an appearance or to advise the Court whether they intend to proceed *pro se* by February 3, 2022.  *Id.*  To date, they have not done so; nor have they made any communications with the Court.  On March 23, 2022, Knox moved to strike defendants Ashmeade and Ferris and enter default judgment against them with respect to the aiding and abetting claims brought pursuant to the NYHRL and NYCHRL.  Doc. 43.  On April 29, 2022, Clean Rite moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56, to dismiss Knox's claims in their entirety.  Doc. 51.

---

[13] Specifically, the Employee Discharge Report provides:  "On April 14th 2019 Natasha was scheduled to work 8am to 4pm[.]  When she arrived[,] she went to the cash register at 8:08am[,] opened the drawer[,] and and took money for a taxi without any permission to do so.  When she was asked by team leader Ashley Peguero about the missing money[,] Natasha informed Ashley that she took [sic] and was not paying it back because the company owes her money and then hung up the phone.  Natasha can be seen taking the money on video at 8:08 am.  District leader has the video.  It is against company policy to take any money [without] permission from upper management.  Her actions result in termination[.]"  Doc. 53-4 at 2.

Clean Rite claims that Ferris terminated Knox at the direction of Baptiste.  Knox disputes that contention, noting that the Baptiste is not once referenced in the Employee Discharge Report.  *See* Doc. 60 at 5.

IV.     **MOTION FOR SUMMARY JUDGMENT**

a.  **Legal Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v.*

*Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR*

*Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it

might "affect the outcome of the litigation under the governing law."  *Id.* (quoting *Miner v.*

*Clinton County N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary

judgment is first responsible for demonstrating the absence of any genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Medical Center*,

706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo*

*v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)

(quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in

opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51

F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some

metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

**b.  Analysis**

**i.  Racial Discrimination Claims**

Knox's employment discrimination claims pursuant to Title VII, § 1981, the NYSHRL, and the NYCHRL are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Cardwell v. Davis Polk & Wardwell LLP*, No. 19 Civ. 10256 (GHW), 2020 WL 6274826, at *16 (S.D.N.Y. Oct. 24, 2020).  Under the *McDonnell Douglas* framework, a plaintiff alleging discrimination must first demonstrate a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If a plaintiff successfully presents a *prima facie* case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action.  *Abdu-Brisson*, 239 F.3d at 468 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  Under the third step of the *McDonnell Douglas* framework, the burden then shifts back to the plaintiff to prove intentional discrimination by a preponderance of the evidence.  *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997).

**1.  *Prima Facie* Case of Discrimination**

13

The Second Circuit has explained that a plaintiff's burden at this stage is *de minimis*. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). In order to state a *prima facie* case for discrimination, a plaintiff must adduce evidence supporting the inference that "discriminat[ion] was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in [its] decision." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (emphasis in original). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) (quoting *Bikerstaff v. Vassar College*, 196 F.3d 435, 451–52 (2d Cir. 1999)).

To prove a *prima facie* case of race discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Ruiz*, 609 F.3d at 491–92 (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). The parties do not dispute the first three elements. Knox is a Black woman and therefore belongs to a protected class; she was minimally qualified for the entry-level CSA position; and she suffered an adverse employment action on April 18, 2019: termination. *See Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) ("Employment actions that [the Second Circuit has] deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment[.]"). The sole question in dispute is whether the circumstances give rise to an inference of discrimination.

As a preliminary point, "a plaintiff may prove discrimination based on evidence that an 'individual shown to have [an] impermissible bias played a meaningful role in the . . . process.'"

14

*See Kenchi v. Hanesbrands Inc.*, No. 10 Civ. 1662 (PKC), 2011 WL 4343418, at *5 (S.D.N.Y.

Aug. 12, 2011) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999).  Knox does

not allege that Ashmeade played any role in the decision to terminate her.  In fact, Knox contends

that Clean Rite transferred Ashmeade to another location approximately one month after she

began to harass Knox and three weeks before Knox's termination.  *See also* Knox Dep. at 32:15–

21, 33:19–23.  Accordingly, Ashmeade's allegedly derogatory remarks do not factor into the

Court's analysis.  It is undisputed, however, that Ferris played a meaningful role in Knox's

termination, even if, as Clean Rite contends, Baptiste directed him to carry out Knox's

termination.  Ferris was Knox's supervisor, took part in investigating the April 14, 2019 incident,

and completed the Employee Discharge Report, Doc. 53-4.  *See, e.g.*, *Brown v. Montefiore*

*Medical Center*, 2019 WL 4738911, at *7 (S.D.N.Y. Sept. 29, 2019) (finding that an employee

who reported and investigated the plaintiff-employee's alleged misconduct and who delivered

notice of the plaintiff's termination played a "meaningful role" in plaintiff's termination, even

though she did not make the ultimate decision.).

　　　With respect to the question of whether there the Court may infer discriminatory intent,

courts have found that such an "inference may be derived from a variety of circumstances,

including the employer's criticism of the plaintiff's performance in ethnically degrading terms[.]"

*See Detouche v. JTR Transp. Corp*, No. 17 Civ. 7719, 2020 WL 7364116, at *10 (S.D.N.Y. Dec.

14, 2019) (internal quotation marks and citations omitted).  And although a plaintiff's burden is

*de minimis,* her assertions cannot be devoid of any specifics.  *Griffin* 103 F. Supp. 2d at 308.

　　　Here, Knox contends that that Ferris started to routinely harass her on the basis of her

race and national origin beginning in mid-March and alleges two specific instances:  that Ferris

told her that she "talks Jamaican when she [is] upset" and and that he said that she looked like

"Aunt Jemima" on a day that she work a headscarf.  *See* Knox Decl. ¶¶ 14–16.  Knox further

purports to have reported the harassment that she experienced from both Ashmeade and Ferris at

least four times:  twice to Butler, between the end of February and early-March 2019; once to

Baptiste, on March 13, 2019; and once to Ferris, on March 25, 2019.  Knox argues that Clean

Rite took no corrective action.  *See* Knox. Dep. at 76:24–77:8, 80:2–18; Knox Decl. ¶ 12.

Accepted as true, Knox's testimony concerning the racial comments that she was subjected to

gives rise to the inference that her termination may have at least in part been motivated by racial

animus.  Accordingly, there is an inference of discriminatory intent, and Knox establishes her

*prima facie* case.

### 2.   Legitimate, Non-discriminatory Reason for Decision

To satisfy the second step of *McDonnell Douglas*, a defendant must offer legitimate and

non-discriminatory reasons for the adverse employment action.  *Abdu-Brisson*, 239 F.3d at 468.

"The employer need not *persuade* the court that it was motivated by the reason it provides; rather

it must simply articulate an explanation that, if true, would connote lawful behavior."  *Greenway

v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original).  "'Any legitimate,

non-discriminatory reason will rebut the presumption triggered by the *prima facie* case.'"

*Ambika Corp.*, 103 F. Supp. 2d at 308 (quoting *Fisher v. Vassar College*, 114 F.3d 1332 1335–36

(2d Cir. 1997)).  Courts have found that on-the-job misconduct always constitutes a legitimate

and nondiscriminatory reason for terminating employment."  *See Canales-Jacobs v. N.Y. State

Office of Court Admin.*, 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009); *see also Jones v. Yonkers

Pub. Sch.*, 326 F. Supp. 2d 536, 543–44 (S.D.N.Y. 2004) (concluding that misconduct and

violation of employer's rules and procedures are legitimate, nondiscriminatory reasons for termination).

Here, Clean Rite offers a legitimate, non-discriminatory reason for its decision to terminate Knox on April 18, 2019:  that four days earlier, she took $15 from the Laundromat's cash register without prior authorization and refused to give it back.  Knox disputes neither that she removed the $15 from the cash register, nor that she refused to return the cash.  *See* Knox Dep. at 102:12–15.  This underlying incident is corroborated by:  (1) video footage; (2) Peguero's April 15, 2019 Corrective Action Report, (attached to Peguero Decl.), Doc. 53-3 at 3; (3) the April 18, 2019 Employee Discharge Report prepared by Ferris, which reflects that Knox took the cash and refused to return it as the the sole reason for Knox's termination, Doc. 53-4 at 2; and (4) affidavits from Baptiste, Ferris, and Peguero.  Additionally, the terms of the Handbook —to which Knox agreed to be bound, *see* Doc. 52-4—provides that theft or refusing to follow a supervisor's instructions are bases for termination.  Doc. 53-2 at 20.  Accordingly, Clean Rite satisfies its burden.

### 3.  Pretext

Because Clean Rite has articulated a legitimate, non-discriminatory reason for Knox's termination, the burden shifts back to Knox to demonstrate that Clean Rite's proffered non-discriminatory reason is pretextual.  The Second Circuit has explained that "there are two distinct ways for a plaintiff to prevail—'either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'"  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (quoting *Fields*, 115 F.3d at 121).  In so deciding, courts

consider "a number of factors . . . includ[ing] the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148–49 (2000).

Knox offers two key arguments for why Clean Rite's explanation for her termination is pretextual:  (1) that Clean Rite permitted CSAs to take money from the cash register if they provided a receipt and that Ferris expressly gave her permission to do so at some point before April 14, 2019; and (2) because her termination occurred directly following her complaints of discrimination.  *See* Doc. 58 at 16 (citing *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) (noting that although "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage . . . a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage.").

Knox fails to carry her burden.  Even accepting as true the (contested) notion that Clean Rite permitted employees to remove money from the cash register with or without permission to reimburse themselves for cab fare, or the idea that Ferris gave her permission to do so in early April 2019, it is undisputed that *Knox refused to return the $15* upon Clean Rite's request.  *See* Knox Dep. at 102:23–103:3.  By failing to return the money she took without prior authorization, Knox behaved insubordinately, providing sound grounds for her termination under the terms of the Handbook.  Knox does not point to a single instance where an employee kept his or her job after refusing to return cash at the direction of management.

Contrary to Knox's contention, the record shows that Clean Rite did not in some way concoct or otherwise use the incident as an excuse to carry out a pre-existing, racially-motivated plan to terminate her.  *See EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994).  The purported theft was brought to the attention of Ferris by Peguero*, who* is not once alleged to have made a racially derogatory remark, and only *after* she noticed the receipt in the cash register and the missing cash.  *See* Doc. 53-3 at 3.  This attenuating circumstance further renders improbable the possibility that Ferris, of his own volition, launched an investigation into Knox's conduct in effort to end her employment because of her race.

What's more, the timing of Knox's termination cuts against her position.  According to Knox, the most recent incident of racial harassment she was subjected to occurred in mid or late March.  *See* Knox Dep. at 80:2–18.  Meanwhile, Knox took the cash on April 14, 2014 and was terminated just four days later.  The temporal nexus between the time she took the cash and her termination is close.

Lastly and perhaps most critically, Knox has also not produced *any* evidence beyond her own statements—direct or circumstantial—that call into question the given reason for her termination.  Caselaw is clear that a "plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment."  *Gonzales v. Beth Israel Med. Ctr.,* 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003); *see, e.g., Cherry v. Byram Hills Cent. School Dist.*, No. 11 Civ. 3872 (ER), 2013 WL 2922483, at *10 (granting summary judgment for the defendant where a Native American plaintiff-employee failed "to offer any 'hard evidence' demonstrating that he was terminated by the [defendant] for

an improper reason," even though he testified that "he had been the target of racially derogatory remarks while employed by the [defendant]").

For all of these reasons, the Court, finds that she has not met her burden and grants summary judgment dismissing her Title VII, § 1981, NYSHRL, and NYCHRL race and national origin discrimination discrimination claims.

### ii. Disability Discrimination Claims

Knox's disability discrimination claims are also subject to the burden-shifting framework set forth in *McDonnell Douglas*.  Again, the Court begins by evaluating whether Knox has made a *prima facie* showing.

> To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

*McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (citing *Sista v. CDC Ixis N. Am., Inc.,* 445 F.d 161, 169 (2d Cir. 2006).  Here, the parties dispute only the fourth element:  whether Knox was fired because of her disability.

In support of her position, Knox asserts that on March 6, 2022, Ashmeade told her that that she "shouldn't have this job" if she required an accommodation and that she should "just do [her] job."  Knox Dep. at 82:17–21.  Knox further alleges that the following week, on March 11, 2019, she received a text message from Ashmeade, stating that she was "off the schedule."  Knox Decl. ¶ 11.  Additionally, Knox argues that Clean Rite did not accommodate her disability, despite having reported it twice—once to Baptiste, and once to Ferris.

20

As already noted, Ashmeade is not alleged to have played any part in Knox's termination. Accordingly, the Court does not consider Ashmeade's remarks in deciding whether Knox has met her *prima facie* burden.  Beyond Ashmeade's statements, however, Knox does not offer any evidence of specific instances of disability discrimination.  Knox does not claim that anyone else made discriminatory remarks about her injured finger or that Clean Rite attempted in any way to strip her of her duties or hours because of her disability.  Indeed, Knox readily admits that she routinely worked *extra* hours, even with her disability.  Knox Decl. ¶ 25.  Knox simply suggests that Clean Rite did not permit her to lift less than 25 pounds.  *Id.* ¶¶ 8–12. But that representation is contradicted by her own deposition testimony.  *See* Knox Dep. at 83:7–84:3 ("Q:  So February to about April [2019], you were doing the less heavy wash and folds.  Is that right? A:  Correct. Q:  And that was Vincent Butler that put that in place?  A:  Yes.).

Even setting aside the fact that a court ruling on motion for summary judgment can disregard an affidavit that contradicts the affiant's deposition testimony,[14] Knox's self-serving, conclusory claim that Clean Rite's failed to accommodate her disability is not sufficiently particularized to give rise to a reasonable inference that her broken finger played a role in Clean Rite's decision to terminate her.  Knox has therefore failed meet her *prima facie* burden, and the Court ends its inquiry here.  Clean Rite's motion for summary judgment to dismiss Knox's Title VII, § 1981, NYSHRL, and NYCHRL disability discrimination discrimination claims is granted.

### iii. Retaliation Claims

Knox further brings retaliation claims against Clean Rite in violation of § 1981, Title VII, the NYSHRL, and the NYCHRL.  Title VII, § 1981, NYSHRL, and NYCHRL all prohibit

---

[14] *See, e.g. AB ex rel. EF v. Rhinebeck Central School Dist.,* 361 F.Supp.2d 312, 316 (S.D.N.Y. 2005) (finding that a "court should not accept an affidavit that contradicts deposition testimony").

retaliation for engaging in a "protected activity."  For example, Title VII prohibits employers from discriminating against an employee because "he [or she] has opposed any practice made an unlawful employment practice by this subchapter" or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).

The "retaliation inquiry under the [NY]CHRL is 'broader than its federal [and state] counterpart[s]." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010) (citing *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 71, 872 N.Y.S.2d 27 (1st Dep't 2009)). Retaliation in any manner is prohibited under the NYCHRL, "and '[t]he retaliation . . . need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment.'" *Id.* (citing N.Y. City Admin. Code § 8-107(7)).  The elements required to assert a prima facie claim of retaliation under the NYCHRL are identical to the federal elements, "except that the plaintiff need not prove any 'adverse' employment action; instead, [she] must prove that something happened 'that would be reasonably likely to deter a person from engaging in protected activity.'" *Jimenez v. City of New York*, 605 F. Supp. 2d 485, 528 (S.D.N.Y. 2009) (internal citations omitted); see also *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 970 N.Y.S.2d 789, 791 (N.Y. App. Div. 2013) ("a plaintiff must show that (1) he or she engaged in a protected activity . . ., (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct").  Retaliation

claims, like discrimination claims, are evaluated under the *McDonnell Douglas* three-step burden-shifting test. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992), the Second Circuit has recognized that "protected activity" includes "informal protests of discriminatory employment practices, including making complaints to management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about prohibited conduct. *Risco*, 868 F. Supp. 2d at 110.  The term "protected activity" refers to "action taken to protest or oppose statutorily prohibited discrimination." *Wimes v. Health*, 157 F. App'x 327, 328 (2d Cir. 2005) (citation omitted).  The plaintiff must "demonstrate that she has asserted a claim of discrimination based on her status as a member of a protected category." *Whitley v. Montefiore Med. Grp.*, No. 13 Civ. 4126 (LTS), 2016 WL 1267788, at *11 (S.D.N.Y. Mar. 30, 2016).  "A generalized complaint about perceived mistreatment without a specific connection to discrimination based on membership in a protected class is insufficient to establish a protected activity." *Id.*

With respect to the first element of a *prima facie* case of retaliation*,* Knox contends that she engaged in a protected activity by filing a formal complaint with Ferris, alleging that she was being discriminated against on the basis of her race and disability.  *See* Knox Dep. at 77:21–78:7. Knox also claims that she made other informal complaints regarding racial and disability discrimination during her time at Clean Rite.  *See id.* at 76:24–77:8, 77:3–20, 78:23–6 (claiming that she complained of racial discrimination twice to Butler); *id.* 84:20–85:16 (claiming that she

complained of racial discrimination and of Clean Rite's failure to accommodate her disability to Baptiste).  Clean Rite, however, asserts that Knox was *not* engaged in a protected activity because she never complained about discrimination on the basis of race or disability and has failed to produce any evidence beyond her own testimony.  Clean Rite maintains that Knox's complaints had only to do with missing wages.

Assuming *arguendo*, that Knox has satisfied her *prima facie* burden, the Court has already found that the incident on April 14, 2019 gave Clean Rite legitimate grounds to terminate her employment.  Accordingly, the burden shifts back to Knox to show a casual connection between her protected activity and Clean Rite's termination of her.  Having already concluded that Clean Rite's reason for terminating her is not pretextual, the Court similarly concludes here that Knox has failed to meet her burden of establishing a connection between her complaints and her discharge.

While Knox is correct that her most recent complaint occurred on or around March 25, 2019, which is reasonably close in time to the date of her termination, Clean Rite has produced substantial evidence, including the Corrective Report and Discharge Report, that the temporally *closer* incident that occurred on April 14, 2019 constitutes the actual reason for her termination.  Again, the Court notes that Knox has failed to furnish any evidence apart from her own testimony that Clean Rite was motivated by retaliatory animus.  At this stage, unsupported declarations are simply not enough.  *See Byram Hills Cent. School Dist.*, 2013 WL 2922483, at *10.  Accordingly, Clean Rite's motion for summary judgment is granted with respect to Knox's retaliation claims.

### iv. Hostile Work Environment Claim

### 1.  Title VII, § 1981, and NYSHRL

The same standards govern hostile work environment claims under Title VII, § 1981, and

NYSHRL.  To state such a claim, a plaintiff must allege that their workplace is "permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Littlejohn*

*v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015).  A plaintiff "need not show that her

hostile working environment was both severe *and* pervasive; only that it was sufficiently severe

*or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her

working conditions." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir.

2010).  A single incident of harassment is ordinarily insufficient to state a hostile work

environment claim, although it is possible if the incident is "extraordinarily severe." *Alfano v.*

*Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citation omitted).  The Court must consider "the

case-specific circumstances in their totality and evaluate the severity, frequency, and degree of

the abuse" to determine whether the "severe and pervasive" threshold is met.  *Id.*  The plaintiff

must also allege that a specific basis exists on which to impute that conduct to the employer.  *See*

*Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998).  The standard is a "demanding

one," and a plaintiff must establish s the alleged harassment was "offensive, pervasive, and

continuous enough" to create an abusive working environment.  *See, e.g., Monterroso v. Sullivan*

*& Cromwell, LLP*, 591 F. Supp. 2d 567, 584–85 (S.D.N.Y. 2008); *Scott v. Memorial Sloan–*

*Kettering Cancer Center*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002).

Over the course of her four months of employment at Clean Rite, Knox alleges that she

was subjected to a hostile work environment during the two months from late February 2019

through her termination on April 18, 2019.  According to Knox, the racial harassment began

when Ashmeade made daily derogatory comments (*e.g.*, calling Knox "hood" and "ghetto," and

saying that the "Yankee" in Knox made her "timid").  *See* Knox Decl. ¶¶ 4–5.  When Ferris

joined Clean Rite in March 2019, he purportedly began to take part in the racial harassment.

With respect to Ferris, Knox cites two incidents:  when Ferris told her that she looked like Aunt

Jemima while wearing a scarf, and when he said that she talked "Jamaican."  *See id.* ¶¶ 14–16.

Setting aside the fact that Clean Rite denies each of these allegations, these examples of

harassment—though deplorable if true—are not sufficiently offensive, pervasive, and continuous

to constitute an abusive working environment.  In *Ford v. N.Y.C. Department of Health & Mental*

*Hygiene*, for example, the court granted the defendant-employer's motion for summary judgment

on plaintiff's Title VII hostile work environment claim where the plaintiff "was [also] subjected

to unkind comments on a daily basis" that attacked her on the basis of her race.  545 F. Supp. 2d

377, 393 (S.D.N.Y. 2008).  Like here, the court noted that:

> First, while [the plaintiff] was subjected to unkind comments on a daily basis, the
> comments continued for only four months.   Second, the comments were not
> physically threatening or severe.  Third, [the plaintiff did] not indicat[e] that the
> teasing interfered with her work performance . . . . Finally, the only evidence
> submitted by Ford regarding the alleged verbal abuse is her own conclusory . . .
> statement[.]

*Id.* at 393 (citing *Lewis v. N. Gen. Hosp.,* 502 F. Supp. 2d 390, 403 (S.D.N.Y. 2007); the

comments continued for only four months"). *Jackson v. Citiwide Corporate Transp., Inc.,* No. 02

Civ. 1323 (DC), 2004 WL 307243, at *2 (S.D.N.Y. Feb. 17, 2004).  In contrast to the facts of

*Ford*, Knox does not allege that any "physical altercations with coworker" took place, and the

purported harassment lasted two months here, not four.  *See id.*

26

Moreover, Knox specifically alleges, at most, five instances of derogatory comments, three of which came from Ashmeade, who Knox admits was transferred to another facility approximately one month after the alleged harassment began.  *See also* Knox Dep. at 32:15–21, 33:19–23.  In analogous cases, courts have found similar claims insufficient for a plaintiff to carry her burden at the summary judgment stage.  *See Finch v. Carrion*, No. 10 Civ. 9691 (VB), 2015 WL 5459991, at *5 (S.D.N.Y. July 9, 2015) (finding that a handful of lewd sexual comments and other physical incidents that occurred over course of two months were "not sufficiently pervasive to establish a hostile work environment claim"); *Green v. Harris Publ'ns, Inc.*, 331 F. Supp. 2d 180, 194 (S.D.N.Y. 2004) (finding of use of the term "ghetto," among other remarks, is not sufficiently severe or pervasive to enable plaintiff to overcome the defendant-employer's motion for summary judgment); *see also Schwapp v. Town of Avon,* 118 F.3d 106, 110–11 (2d Cir. 1997) ("Whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment"); *Waters v. Gen. Bd. of Glob. Ministries*, 769 F. Supp. 2d 545, 554 (S.D.N.Y. 2011) ("As many courts have recognized, where the plaintiff and the individual whose conduct is at issue are members of the same protected class, the inference that the conduct constitutes harassment or discrimination is weakened").

Accordingly, for the reasons set forth, the Court determines that no reasonable juror could conclude that plaintiff's work environment was "permeated with discriminatory intimidation, ridicule and insult" that was so severe or pervasive as to alter the conditions of his employment. *Torres v. Posano*, 116 F.3d 625, 630–31 (2d. Cir. 1997) (internal quotation marks and citation

omitted).  The Court grants Clean Rite's motion for summary judgment to dismiss Knox's hostile

work environment claims pursuant to Title VII, § 1981, and NYSHRL.

### 2.  NYCHRL

Claims under the NYCHRL are to be considered independently and construed more

broadly in favor of plaintiffs alleging discrimination.  *Mihalik v. Credit Agricole Cheuvreux N.*

*Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  Under the NYCHRL, a plaintiff must allege that she

was treated less well than other employees because of her protected status, and that

discriminatory intent was a motivating factor.  *Id.*; *see also Chin v. N.Y.C. Hous. Auth.*, 106

A.D.3d 443, 445 (1st Dep't 2013).  Unlike under Title VII and the NYSHRL, a plaintiff seeking

to maintain a hostile-work-environment claim under the NYCHRL need not show that the

claimed hostile conduct was "severe or pervasive"  *Rossbach v. Montefiore Medical Center*, No.

19 Civ. 5758 (DLC), 2021 WL 930710, at *6 (S.D.N.Y. Mar. 11, 2021).  Like its federal and state

counterparts, however, the NYCHRL "is . . . not a general civility code. . . . [P]etty slights and

trivial inconveniences are not actionable.'"  *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650,

671 (S.D.N.Y. 2012) (citing *Campbell v. Cellco Partnership*, 860 F. Supp. 2d 284, 289 (S.D.N.Y.

2012)).  And a plaintiff is still required "to plead that she was subjected to an environment hostile

enough to force her to quit *because of* some factor prohibited by the statute."  *Zick v. Waterfront*

*Com'n of New York Harbor*, No. 11 Civ. 5093 (CM), 2012 WL 4785703, at *9 (S.D.N.Y. Oct. 4,

2012) (emphasis in the original).  Moreover, "[i]f the defendant can provide a legitimate non-

discriminatory reason for its actions, 'summary judgment is appropriate if the record establishes

as a matter of law that discrimination or retaliation played no role in the defendant's actions.'"

*Rossbach*, 2021 WL 930710, at *6 (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015)).

As explained above, Knox specifically alleges, at most, five instances of derogatory comments. While it is a close call as to whether these actions amount to more than "petty slights," courts in this Circuit have dismissed hostile work environment claims grounded in allegations of arguably *more* hostile racially-motivated comments. *See, e.g.*, *Diagne v. New York Life Ins. Co.*, No. 09 Civ. 5157 (GWG), 2010 WL 5625829, at *3 (S.D.N.Y. 2010) (granting summary judgment for defendants on a NYCHRL hostile work environment claim where plaintiff alleged that defendants directed a religious slur at him, *i.e.*, "we should kick this fucking Muslim out of this country"); *Davis-Bell v. Columbia University*, 851 F.Supp.2d 650, 675 (granting summary judgment on a NYCHRL hostile work environment claim where plaintiff alleged he was told that his employer "did not like [B]lacks"). Moreover, Clean Rite has presented a legitimate, non-discriminatory reason for her discharge, and Knox has failed to demonstrate that this reason was pretextual or that this reason was not Clean Rite's sole basis for taking action. *See Rossbach*, 2021 WL 930710, at *6 (citing *Ya-Chen Chen.*, 805 F.3d at 75–76).

Accordingly, in this case, summary judgment is warranted on Knox's NYCHRL hostile work environment claim stemming from her firing.

### v. Wage and Hour Claims

Knox alleges that Clean Rite: (1) failed to pay her minimum wage or overtime in violation of the FLSA and NYLL; and (2) failed to provide notice of rate of pay and regular pay day, or wage statements, in violation of the NYLL. To rebut these claims, Clean Rite has produced Knox's Notice and Acknowledgment of pay Rate and Pay Day in English, which she

executed on December 17, 2018.  *See* Doc. 52-6.  Clean Rite has also produced pay summaries

for each of Knox's pay period, which reflect that Knox was compensated in full for each

period—including for the enhanced $22.50 for overtime hours.  *See generally* Doc. 52-7.

Knox does not dispute the authenticity of the summaries.  She insists only that the

summaries "do not foreclose [her claims because] she worked hours at other locations that were

not recorded and were not present on her pay statements."  *See* Doc. 58 at 22.  Caselaw is clear

that at the summary judgment stage, however, that the non-moving party must do more than

show that there is "some metaphysical doubt as to the material facts."  *McClellan*, 439 F.3d at

144.  Knox has produced no evidence whatsoever to support her broad and conclusory claim that

she worked hours for which she was not paid.  Absent a *genuine* dispute, Clean Rite's motion for

summary judgment to dismiss Knox's wage and hour claims is granted.

## V.      MOTION TO STRIKE AND FOR DEFAULT JUDGMENT

Because Defendants Ashmeade and Ferris have not retained counsel or appeared *pro se,*

despite the Court's order for them to do so by February 3, 2022—and have not communicated

with the Court, Clean Rite, or Knox—Knox requests that the Court strike Ashmeade's and Ferris'

answer and enter default judgment against them.  *See* Doc. 20.  As explained below, because

Knox has no viable claims against Ashmeade or Ferris, Knox's motion is denied as moot.

The complaint alleges that individual Defendants Ashmeade and Ferris aided and abetted

in an unlawful discriminatory practice in violation of NYSHRL and NYCHRL.  The NYSHRL

and the NYCHRL prohibit any person from "aid[ing], abet[ting], incit[ing], compel[ling], or

coerc[ing] . . . any of the acts forbidden" by the statutes. N.Y. Exec. Law § 296(6); N.Y.C. Admin

Code § 8-107(6). "The same standards of analysis used to evaluate aiding and abetting claims

under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is virtually identical." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (citation omitted). A defendant must "actually participate[ ] in the conduct giving rise to a . . . claim" in order to be held liable under the NYSHRL and the NYCHRL. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1999).

Where a court has found no violation of the NYSHRL or NYCHRL, as here, individual employees cannot be held liable for aiding and abetting their own violations. *See, e.g.*, *Godwin v. Sirva, Inc.*, 291 F. Supp. 3d 245, 254 (E.D.N.Y. 2018); *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012) ("[A]s the employee's liability [under NYSHRL] necessarily hinges on that of the employer, the employer must be held liable for an individual to also be held liable."). Accordingly, Defendants are entitled to summary judgment on Knox's claims brought pursuant to the NYSHRL and NYCHRL against Ashmeade and Ferris. Having dismissed the balance of Knox's complaint, her pending motion to strike is moot.

## VI.   CONCLUSION

For the foregoing reasons, Clean Rite's motion for summary judgment is GRANTED in its entirety, and Knox's motion to strike Defendants Ashmeade's and Ferris' answers is DENIED. The Clerk of Court is respectfully directed to terminate the motions, Docs. 43 and 51, and to close the case.


It is SO ORDERED.

Dated:   January 3, 2023
         New York, New York

_____
          Edgardo Ramos, U.S.D.J.